UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

TONYA SCOTT,

               Plaintiff,

      v.                                                   18-CV-1287
                                                         DECISION & ORDER

COMMISSIONER OF SOCIAL
SECURITY,

               Defendant.

_____

On November 14, 2018, the plaintiff, Tonya Scott, brought this action under the

Social Security Act.  She seeks review of the determination by the Commissioner of

Social Security ("Commissioner") that she was not disabled.  Docket Item 1.  On May

28, 2019, Scott moved for judgment on the pleadings, Docket Item 8; on September 27,

2019, the Commissioner responded and cross-moved for judgment on the pleadings,

Docket Item 16; and on October 18, 2019, Scott replied, Docket Item 18.

For the reasons stated below, this Court grants Scott's motion in part and denies

the Commissioner's cross-motion.[1]

**STANDARD OF REVIEW**

"The scope of review of a disability determination . . . involves two levels of

inquiry."  *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  The court "must first

decide whether [the Commissioner] applied the correct legal principles in making the

---

[1]  This Court assumes familiarity with the underlying facts, the procedural history,
and the ALJ's decision and will refer only to the facts necessary to explain its decision.

determination." *Id.* This includes ensuring "that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Social Security Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). Then, the court "decide[s] whether the determination is supported by 'substantial evidence.'" *Johnson*, 817 F.2d at 985 (quoting 42 U.S.C. § 405(g)). "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles." *Johnson*, 817 F.2d at 986.

## DISCUSSION

## I.     ALLEGATIONS

Scott argues that the ALJ erred in two ways. Docket Item 8-1 at 1. First, she argues that the ALJ erred in rejecting the opinion of Scott's treating physician. *Id.* Second, she contends that the ALJ improperly relied on her own lay judgment in determining Scott's RFC. *Id.* This Court agrees that the ALJ erred prejudicially and therefore remands so that the ALJ can reevaluate the opinion of Scott's treating physician and properly determine Scott's RFC.

## II.   ANALYSIS

### A.  The Treating-Physician Rule

When determining a claimant's RFC, an ALJ must evaluate every medical opinion received.  20 C.F.R. § 416.927(c).  But an ALJ generally should give greater weight to the medical opinions of treating sources—physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists who have "ongoing treatment relationship[s]" with the claimant—because those medical professionals are in the best positions to provide "detailed, longitudinal picture[s] of [the claimant's] medical impairments."  *See* 20 C.F.R. § 404.1527(a)(2), (c)(2); *see also Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) (summary order).  In fact, a treating physician's opinion is entitled to controlling weight so long as it is "well-supported [sic] by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  20 C.F.R. § 404.1527(c)(2).

Before an ALJ may give less-than-controlling weight to a treating source's opinion, the ALJ must "explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and[ ] (4) whether the physician is a specialist."  *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quotations and alterations omitted).  These are the so-called "*Burgess* factors" from *Burgess v. Astrue*, 537 F.3d 117 (2d Cir. 2008).  *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019).  "An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight" to a treating source opinion "is a procedural error."  *Id.* at 96 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam)).

3

Here, the ALJ gave "little weight" to the opinion of Scott's treating physician, Nicholas Silvestri, M.D.  Docket Item 5 at 36.  Dr. Silvestri treated Scott from June 2015 until at least November 2016.  *Id.* at 661-726.  Upon initial examination, Dr. Silvestri diagnosed Scott with "severe, frequent, [and] treatment-refractory migraine headaches despite treatment with multiple medications."  *Id.* at 726.  Between October 2015 and November 2016, he administered five rounds of Botox injections to treat Scott's headaches.  *Id.* at 664, 669, 674, 679, 688.

In March 2017, Dr. Silvestri opined that when Scott experienced a migraine headache, she generally would be unable to perform even basic work activities and would need a break.  *Id.* at 1032.  According to Dr. Silvestri, Scott would need such a break about once to twice per week for one to two hours, during which time she would need to lie down or sit quietly.  *Id.* at 1032-33.  Additionally, she would be absent from work about four times per month as a result of her headaches.  *Id.* at 1033.  Dr. Silvestri also opined that Scott was capable of only low stress jobs, as stress would worsen her headaches.  *Id.*  Finally, he noted that Scott's condition improved with Botox treatment.  *Id.* at 1031.

The ALJ accorded "little weight" to Dr. Silvestri's opinion for two reasons.  *Id.* at 36.  First, the ALJ found that "[Dr. Silvestri's opinion] is overly restrictive when compared to his contemporary treatment notes."  *Id.*  In this regard, the ALJ cited Dr. Silvestri's notes from November 2016, which state that "[Scott] admitted to less frequent and less severe migraines with Botox injections," "denied neurological symptoms," and "experienced a significant and robust response to Botox."  *Id.*  Second, the ALJ found that "[Dr. Silvestri's opinion] is overly restrictive when considering the other severe

4

impairments, as the evidence reveals that [Scott] was able to handle her activities of daily living with her opiate therapy and that she was responding to trigger injections." *Id.*

The ALJ failed to "explicitly" consider several of the *Burgess* factors before assigning "little weight" to Dr. Silvestri's opinion.  *Id.*  In explaining the reasons for discounting Dr. Silvestri's opinion, for example, the ALJ referred only to Dr. Silvestri's treatment notes from November 2016 and never acknowledged that Dr. Silvestri had treated Scott consistently since June 2015.  *Id.*  The ALJ thus failed to "explicitly" consider "the frequency, length, nature, and extent of [Dr. Silvestri's] treatment."  *See Greek*, 802 F.3d at 375.  Nor did the ALJ discuss how Dr. Silvestri's training in neurology and role in administering Scott's Botox injections might provide him with unique insight into the intensity, persistence, and limiting effects of Scott's headaches. In other words, the ALJ also failed to "explicitly" consider "whether [Dr. Silvestri] is a specialist."  *Id.*

"Because the ALJ procedurally erred, the question becomes whether 'a searching review of the record assures [this Court] that the substance of the [treating-physician] rule was not traversed'—*i.e.*, whether the record otherwise provides 'good reasons' for assigning 'little weight'" to Dr. Silvestri's opinion.  *See Estrella*, 925 F.3d at 96 (alterations omitted) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d. Cir. 2004) (per curiam)); *see also Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (declining remand where "application of the correct legal principles to the record could lead [only to the same] conclusion").  The Court finds no such assurance here.

As explained above, the ALJ gave "little weight" to Dr. Silvestri's opinion because "it is overly restrictive when compared to his contemporaneous treatment notes." Docket Item 5 at 36.  But those treatment notes suggest that the frequency and intensity of Scott's migraine headaches fluctuated after Scott began receiving Botox injections on October 2, 2015.  *See id.* at 661-89.

More specifically, about four weeks after the first round of Botox injections, Dr. Silvestri noted that Scott did not respond to that treatment and had been experiencing severe rebound headaches.  *Id.* at 681, 684.  By April 2016—that is, the first six weeks after the second round of Botox injections—Scott's headaches were less frequent (once per week) and severe, but they returned to their previous frequency after that.  *Id.* at 671.  In August 2016, after the third round of Botox injections, Scott said that her headaches were more frequent (several times per week) and more severe.  *Id.* at 666. Then, after the fourth round of Botox injections in November 2016, Scott reported that her headaches were much less frequent (once to twice per week) and less severe, *id.* at 661, and Dr. Silvestri noted that Scott had "experienced a significant and robust response" to this round of treatment, *id.* at 664.  Thus, although Scott showed some improvement as a result of Botox treatment, that improvement was anything but consistent.

The ALJ acknowledged Scott's "intermittent exacerbations," but concluded that Scott's headaches "[were] not as limiting as alleged," because "the most recent evidence reveals that Dr. Silvestri found that [Scott] experienced a significant and robust response to Botox."  *Id.* at 33.  In reaching that conclusion, however, the ALJ failed to "'grapple with' the apparent longitudinal inconsistencies" in Scott's response to Botox

6

injections—"one of the motivations behind *Burgess*'s procedural requirement of explicit consideration of 'the frequen[cy], length, nature, and extent of [a physician's] treatment.'" *Estrella*, 925 F.3d at 97 (citing *Selian*, 708 F.3d at 418-19).  Indeed, the ALJ focused on only the most recent improvement after a series of ups and downs that lasted more than a year, concluding from that single successful treatment that Scott's headaches could be effectively controlled by Botox injections.  *See id.* ("[I]t is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." (quoting *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014))).  But the ALJ did not acknowledge that Scott's headaches had similarly improved after the second round of Botox injections only to worsen later.  Nor did the ALJ offer any medical opinion to support her conclusion that, unlike the second round of treatment which offered only a temporary solution to Scott's problem, the fourth round of treatment permanently did the trick.  Such an inconsistent evaluation of the medical evidence undermines the ALJ's conclusion that Dr. Silvestri's opinion is overly restrictive and deserves little weight.  *See Shaw v. Chater*, 221 F.3d 126, 135 (2d. Cir. 2000) (explaining that "[the ALJ's] inconsistent use of the medical evidence undermines any argument that [the treating physician's] opinion was so unreliable that it should not have been assigned controlling weight").

The ALJ's finding that Dr. Silvestri's opinion "is overly restrictive . . . , as the evidence reveals that [Scott] was able to handle her activities of daily living with her opiate therapy and that she was responding to trigger injections" is also flawed.  Docket Item 5 at 36.  The "evidence" to which the ALJ referred are the treatment notes of pain-

management specialist Su Zhan, M.D., Ph.D., which state that "[Scott] has been responding to trigger point injections for her *low back pain*" and "[w]ith her opiate therapy, she has been able to take care of herself independently including self bathing, dressing, and toileting." *Id.* at 1021 (emphasis added). In contrast, Dr. Silvestri's opinion that Scott was limited in her ability to work rested on a different impairment—migraine headaches. So Dr. Zhan's notes are irrelevant to Dr. Silvestri's conclusion about migraines, and the ALJ erred in suggesting otherwise. *See Greek*, 802 F.3d at 375-76 (rejecting the ALJ's determination that the treating physician's opinion that the claimant was "100% disabled" for work contradicted the evidence that the claimant retained certain postural functions and could perform certain daily activities, because the treating physician's conclusion "rested on a different set of problems that made it hard for [the claimant] to work—his memory loss, intermittent confusion, and diabetes").

For all those reasons, the ALJ erred in assigning little weight to Dr. Silvestri's opinion without explicitly considering the *Burgess* factors.

### B. The ALJ's RFC Determination

What is more, the ALJ improperly relied on her own lay judgment in determining Scott's RFC. "Although the RFC determination is an issue reserved for the [C]ommissioner, an ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings." *Thomas v. Comm'r of Soc. Sec.*, 2019 WL 2295400, at *2 (W.D.N.Y. May 30, 2019) (quoting *House v. Astrue*, 2013 WL 422058, at *4 (N.D.N.Y. Feb. 1, 2013)). Thus, "where the transcript contains only diagnostic evidence and no [supporting] opinion from a medical source about functional limitation . . . , the ALJ [generally] must recontact [a treating physician], order a consultative examination, or

8

have a medical expert testify at the hearing." *Skupien v. Colvin*, 2014 WL 3533425, at

*6 (W.D.N.Y. July 16, 2014) (quoting *Deskin v. Comm'r of Soc. Sec.*, 605 F.Supp.2d

908, 913 (N.D. Oh. 2008)); *see also Thomas*, 2019 WL 2295400, at *2 (explaining that

"an ALJ's determination of RFC without a medical advisor's assessment is not

supported by substantial evidence" (quoting *House*, 2013 WL 422058, at *4)).

Here, the ALJ concluded that Scott could perform:

> light work[2] as defined in 20 CFR 404.1567(b) and
> 416.967(b) except [that she could]: occasional[ly] climb
> ramps or stairs; occasional[ly] climb ladders, ropes, or
> scaffolds; occasional[ly] balance, stoop, crouch, kneel, [or]
> crawl; frequent[ly] handl[e] objects, that is gross
> manipulation with both hands; frequent[ly] finger[ ] objects,
> that is fine manipulation, with both hands; frequent[ly] feel[ ]
> with both hands; [have] occasional exposure to moving
> mechanical parts; occasional[ly] operat[e] a motor vehicle;
> [have] occasional exposure to unprotected heights; [and]
> perform routine and repetitive tasks.

Docket Item 5 at 26-27 (footnote added).  The ALJ explained that this RFC

determination accommodated "[Scott's] complaints of all over pain from her fibromyalgia

and low back pain from her lumbar degenerative disc disease by limiting her to a light

[RFC] with occasional postural activities" and "[Scott's] Raynaud's disease with upper

extremity neuropathy by limiting her to frequent handling, fingering, and feeling with

both hands." *Id.* at 31-32.  In the ALJ's view, "[Scott's] fibromyalgia, lumbar

degenerative disc disease, and complaints of lower extremity neuropathy [did] not limit

her ability to sit, stand, and walk as alleged," and Scott therefore "remain[ed] capable of

---

[2]  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. §§ 404.1567(b); 416.967(b).

sitting, standing, and walking within the light [RFC]." *Id.* at 32.  The ALJ also found that

"[Scott's] migraines [were] not as limiting as testified to by [Scott] and that a light [RFC]

with environmental restrictions adequately account[ed] for this impairment," noting that

"medications helped control the frequency and intensity of [Scott's] migraines." *Id.*  The

ALJ therefore limited Scott to occasional exposure to moving mechanical parts and

unprotected heights as well as occasional operation of a motor vehicle.  *Id.* at 33.

    As noted above, in determining Scott's RFC, the ALJ assigned "little weight" to

the opinion of Dr. Silvestri, Scott's treating physician.  *Id.* at 36.  In addition, the ALJ

accorded only "partial weight" to the opinion of consultative examiner Hongbiao Liu,

M.D., the only other medical opinion regarding Scott's physical RFC.  *Id.* at 35.[3]  In the

absence of medical opinions supporting her physical RFC determination, the ALJ

necessarily relied only on her own lay judgment.  *See Sherry v. Berryhill*, 2019 WL

441597, at *5 (W.D.N.Y. Feb. 5, 2019) ("The Court cannot conclude that there was

substantial evidence to support the ALJ's RFC determination that plaintiff was capable

of light work with restrictions and is left without a clear indication of how the ALJ

reached the RFC determination without resorting to impermissible interpretation of raw

medical data.").

    For example, the ALJ purported to agree with Dr. Liu that Scott had "mild to

moderate limitation for prolonged walking, bending, and kneeling" due to her

fibromyalgia and lumbar degenerative disease.  Docket Item 5 at 35.  But it is not at all

---

    [3] In January 2015, Dr. Liu examined Scott.  Docket Item 5 at 646.  He opined
that Scott had "mild to moderate limitation for prolonged walking, bending, and
kneeling."  *Id.* at 649.  He noted, *inter alia*, that Scott was unable to "perform heel and
toe walking" and could only "squat 10% because of low back pain," and that there were
"[a]t least 11 trigger points in [her] neck and back area."  *Id.* at 647-48.

clear how the ALJ was able to glean from Dr. Liu's assessment that Scott could perform light work, which generally requires "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour work day" or "sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls."  *See* SSR 83-10, 1983 WL 31251, at *5-6 (Jan. 1 1983).  It is likewise unclear how the ALJ determined that Scott could "occasional[ly] climb ladders, ropes, or scaffolds," Docket Item 5 at 26, notwithstanding her "severe . . . fibromyalgia" and "lumbar degenerative disc disease," *see id.* at 24.  *Cf. Thomas*, 2019 WL 2295400, at *2 (remanding where "[a]ll of the records in the case consist of clinical notes that have no medical source statements and no other assessments of plaintiff's exertional and non-exertional abilities," yet "the Commissioner crafted a very specific RFC that included references to ladders, ropes, and scaffolds").

Moreover, the ALJ found that "due to [Scott's] . . . migraine headaches, [she had] further . . . environmental limitations not included within Dr. Liu's opinion."  Docket Item 5 at 35.  Because Dr. Liu did not opine about Scott's migraine headaches and the ALJ assigned only little weight to Dr. Silvestri's opinion, the ALJ was left with no medical opinions regarding the limitations necessary to accommodate Scott's migraine headaches.  For this reason, the ALJ's conclusion that Scott should have only "occasional exposure to moving mechanical parts" and "unprotected heights" is puzzling, *id.* at 27, since no medical opinions suggested that such limitations would allow Scott to perform light work notwithstanding her migraine headaches.

Similarly, in formulating the mental RFC, the ALJ assigned only "partial weight" to

11

the opinion of H. Tzetzo.[4]  *Id.* at 35.  The ALJ partially rejected Dr. Tzetzo's opinion because it failed to accommodate for Scott's anxiety.  *Id.*  In contrast, the ALJ found that "[Scott's] anxiety and depression [were] severe impairments and therefore [Scott was] best suited for routine and repetitive tasks."  *Id.*  But again, the ALJ provided no explanation of how she was able to conclude that limiting Scott to routine and repetitive tasks could adequately accommodate for those severe mental impairments.  And the medical evidence provided no support for that conclusion.

The ALJ appears to have accepted the opinion of Gregory Fabiano, Ph.D., that Scott had "mild limitations in her ability to relate adequately with others and appropriately deal with stress."  *Id.* at 642.[5]  But the ALJ did not include any specific accommodations for those mental limitations in the RFC determination; nor did she explain why limiting Scott to routine and repetitive tasks would adequately address them.  Consequently, the ALJ failed to ground her mental RFC determination in medical or psychological opinions.

"[T]he absence of a properly grounded RFC constitutes legal error that requires remand regardless of any underlying raw data."  *Thomas*, 2019 WL 2295400, at *2.

---

[4]  State agency psychological consultant Dr. Tzetzo's credentials are not provided, but, as the Commissioner notes, the medical code listed next to Dr. Tzetzo's signature—"37"—indicates a specialty in psychiatry.  *See* Docket Item 16-1 at 10 n.2.  In January 2015, Dr. Tzetzo evaluated Scott's mental functioning based on a review of the record.  Docket Item 5 at 104.  Dr. Tzetzo opined that Scott "should be able to handle normal work pressures" and that her "psychiatric impairments [were] non-severe."  *Id.*

[5]  In January 2015, Dr. Fabiano completed a consultative psychological examination of Scott.  Docket Item 5 at 639.  He opined that Scott had "mild limitations in her ability to relate adequately with others and appropriately deal with stress," but her psychiatric conditions "[did] not appear to be significant enough to interfere with [her] ability to function on a daily basis."  *Id.* at 642.

Here, the ALJ's use of her own lay judgment to formulate Scott's RFC constituted just such an error. *See Perkins v. Berryhill*, 2018 WL 3372964, at *4 (W.D.N.Y. July 11, 2018) ("Without reliance on a medical source's opinion or a function-by-function assessment connecting the medical evidence to the RFC, the ALJ's decision leaves the Court with many unanswered questions and does not afford an adequate basis for meaningful judicial review.").

In light of the ALJ's failure to "explicitly consider" the *Burgess* factors before assigning less-than-controlling weight to the opinion of Scott's treating physician, as well as the ALJ's improper reliance on her own lay judgment to formulate Scott's RFC, the Court remands this case for further administrative proceedings.  On remand, the ALJ should reconsider the opinion of Scott's treating physician after explicitly applying all four *Burgess* factors.  The ALJ also should ground her RFC determination in a medical opinion or opinions in the record; alternatively, she should solicit additional medical opinions regarding Scott's functional capacity.

## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings, Docket Item 16, is DENIED, and Scott's motion for judgment on the pleadings, Docket Item 8, is GRANTED in part and DENIED in part.  The decision of the

Commissioner is VACATED, and the matter is REMANDED for further administrative proceedings consistent with this decision.

     SO ORDERED.


Dated:      July 14, 2020
           Buffalo, New York


                                             */s/ Lawrence J. Vilardo*
                                             LAWRENCE J. VILARDO
                                             UNITED STATES DISTRICT JUDGE